for a proper judgment. (*People* agt. *Taylor*, 3 *Denio*, 91; *Commonwealth* agt. *Fischblatt*, 4 *Met. R.* 354; *Dyer* agt. *Commonwealth*, 23 *Pick.* 404; 2 *Campb. R.* 646.)

## SUPREME COURT.

### In the Matter of the RECIPROCITY BANK.

The seventh section of the eighth article of the constitution (1846) of this state, and the act of 1849 (*Sess. Laws* 1849, *ch.* 226, *p.* 340) in aid of said constitution, apply to banks and to *stockholders* of banks chartered before the passage of such constitution and act. That is, they are applicable to banks chartered under the late safety fund system, and render the stockholders individually liable according to their provisions.

And neither the said constitution nor the said act of 1849 is in violation of the provisions of the constitution of the United States, which declares that no state shall pass any "law impairing the obligation of contracts," wherever, as in this case, the legislature have reserved in the charters the words, that "the legislature may at any time alter, modify or repeal this act, or any of its provisions."

Although, by the constitution previous to 1846, "the assent of two-thirds of the members elected to each branch of the legislature shall be requisite to every bill, &c., creating, continuing, altering or renewing any body politic or corporate," and although the act of 1849, which altered this charter, had not the assent of two-thirds of the legislature to its passage, yet the act was valid, passed as it was under and according to the provisions of the constitution of 1846, which does not require the assent of two-thirds of the legislature to such a bill.

Under the act of 1849, the court have the power to order an apportionment of the debts of the corporation among the stockholders, although there may be assets of the corporation undisposed of in the receiver's hands.

Married women could own stock in banks in their own right, both at common law and under the act of 1848–9, and the legislature had the power to alter the common law so as to make them personally liable to the amount of their stock. It has thought proper to do so, and the court is bound to enforce the liability; but it affects their property alone. What it is worth to and how it may be enforced by creditors, are questions upon which the court here is not required to pass.

*Erie Special Term, April,* 1859.

MOTION to confirm the report of the referee to whom it was

referred to apportion the debts and liabilities of the Recipro-
city Bank among the several stockholders liable for the same,
under the act of 1849 (ch. 226)[1].

H. W. ROGERS for WM. WILLIAMS, Receiver, &c.

The following named counsel appeared and filed exceptions
to the report in behalf of the parties hereinafter named:

JOHN GANSON for the North Western Insurance Company,
ELIJAH P. WILLIAMS and WILLIAM G. FARGO.

WARD HUNT for JOHN SAVAGE.

J. L. CURTENIUS for S. NEWTON DEXTER and others.

H. C. VAN VORST for JAMES R. BOYD and others.

F. KERNAN for H. P. ALEXANDER and others.

Mr. LANSING for himself and others.

Mr. CLARK for ERASTUS ROGERS and others.

Mr. FORD for himself and others.


GREENE, Justice.   After a careful consideration of the ques-
tions raised on the argument, I have come to the conclusion that
the report of the referee should be confirmed.   It would be
alike impracticable and unprofitable to refer in this opinion at
length to the various minor questions raised by the different
exceptors.   Many of them relate to the practice under the act
in question, and I will merely remark that such of them as
were not considered and decided by the court of appeals "in
the Matter of the Empire City Bank," I have had frequent
occasion to examine with care in the progress of this proceed-
ing, which has been conducted, I believe, entirely before me
upon a reconsideration of my previous conclusions.   I am con-
vinced that the proceedings have in all respects been con-
ducted in substantial compliance with the act.

I will therefore proceed to the examination of the objections

[1] NOTE.—The Sackett's Harbor Bank was incorporated, under the safety fund
system, in the year 1834, and transacted business at Sackett's Harbor until the
year 1852, when it was authorized to change its place of business to the city of
Buffalo.   By an act of the legislature, passed March 6, 1857, the name of the
Sackett's Harbor Bank was changed to the "Reciprocity Bank."

In the Matter of the Reciprocity Bank.

in which all the exceptors unite on the argument, and which question directly the validity of any proceedings in any form under the statute against this bank.

First, then, it is claimed that neither the provisions of the act of 1849, nor of the constitution in aid of which that act was passed, extend, either in terms or by fair implication, to the Reciprocity Bank, for the reason that it was created and existed anterior to the constitution and the statute, and that both, if not so declared in terms, are by plain implication prospective in their character, and must be so limited in their operation. The safest, and indeed the only test of the soundness of this position, will be found by resorting to the primary, and, in the absence of any ambiguity or obscurity appearing there, the *exclusive* evidence as to the intention of the people in adopting the constitution, and of the legislature in passing the statute, namely, *the language of those instruments*. I think both the constitution and the statute apply in plain terms to this corporation. The language of the seventh section of the eighth article of the constitution is, " the stockholders of *every* corporation, &c., for banking purposes, issuing bank notes, &c., to circulate as money after the first day of January, one thousand eight hundred and fifty, shall be individually responsible to the amount of their respective share or shares of stock in any such corporation, &c., for all its debts and liabilities of every kind contracted after the first day of January, one thousand eight hundred and fifty."

I do not see how the convention could have adopted language plainer or more comprehensive and apt than this, to express an intention to include *all corporations*, without regard to the date or purpose of their incorporation. The language of the statute seems to me equally clear. It is (§ 1): " Whenever default shall be made in the payment of any debt or liability contracted after the first day of January, one thousand eight hundred and fifty, by *any corporation* or joint stock association, &c., the stockholders of such corporation or association shall be individually responsible," &c. This language seems to me to admit of but one interpretation. It expresses but one

meaning, and neither needs nor admits of construction, and here, as is my strong inclination to and general practice in such cases, I should rest the case and arrest argument.

But the earnestness and distinguished ability with which the position in question was argued and urged upon me on the argument, not only command my respect, but seem to excuse, if they do not require, some discussion of the proposition on general principles. And in the first place, the inquiry appears to be natural and significant, why, if it was the intention of the framers of the constitution to exempt stockholders in existing corporations of this description from the contemplated liability, did they fix upon a period of three years after the constitution was designed to take effect, as the time when this provision should go into operation? If it was intended to apply to corporations to be created in future, those who desired to become stockholders in such corporations would do so with a full knowledge of the liabilities which they would incur by so doing; and no postponement of the time when this provision should take effect would be necessary for their protection, or consistent with the general policy indicated by this section. It is apparent, on the contrary, that the framers of the constitution intended to establish a general rule of personal liability on the part of stockholders, applicable to all corporations of this sort, and to postpone its operation to such a time as would enable all interested in their stock and business to shape their affairs with a view to the known responsibilities which would be incident to their future operations. This, among many other considerations which might be urged, is to my mind very significant as to the intention of the framers of the constitution, and if it was possible to add anything to the force of the very clear and simple language in which that intention is expressed, we have ample assurance, from this view of the case, that that language was deliberately chosen and well considered with the intent to express precisely what it so plainly imports. The absence, also, of any word in the section to limit or qualify the very general terms used, when the two words, "hereafter created," inserted after the word "purposes," in the second line,

would have done it so effectually, and would, moreover, have occurred so naturally to an intelligent draughtsman, having such an intention, seem to exclude the idea of any such limited application of the language of the section as is now contended for. But this is not all the extrinsic evidence we have on this subject. It appears from the reported proceedings of the convention (*Atlas ed. 997 and 998*), that the precise amendment just suggested was proposed in the convention when this section was under discussion, and was rejected after debate and consideration. I cannot well see how we could get an accumulation of evidence more varied and pertinent in its character, or conclusive in its force, than is derived from all these sources. It tends uniformly to one conclusion, and that I have already suggested.

But it is claimed by the several exceptors, that if the constitution and statute are applicable in terms to this corporation, their provisions are void, for the reason that they are in conflict with that provision of the tenth section of the first article of the constitution of the United States, which declares that no state shall pass any "law impairing the obligation of contracts." The charter of this corporation was granted by the legislature of this state in 1834. (*Sess. Laws, ch.* 204, *p.* 355.) It contains no provisions subjecting the stockholders to any personal liability whatever; but the 37th section is in these words : " The legislature may at any time alter, modify or repeal this act or any of its provisions." That this charter was a contract between the state and the corporators, there can be no doubt. The question is, whether the act of 1849, which added to the terms or " obligations " of the original contract the personal liability of the corporators for the debts of the corporation, essentially changed, or, in the language of the constitutional prohibition which we are considering, " impairs the obligation " of that contract. The exceptors cite and rely upon the cases of *The Piqua Branch of State Bank of .Ohio* agt. *Knoop* (16 *How. U. S. Rep.* 369), and *Dodge* agt. *Woolsey* (18 *id.* 331), as authorities on this point. A short statement of those cases will be sufficient to show their bearing upon the

question under consideration.   By a law passed by the general assembly of Ohio, in 1845, it was provided that all banks, organized under that act and accepting its provisions, should semi-annually set off and pay to the state a certain per cent. on its profits for the last half year, which sum was to be accepted by the state in "lieu of all taxes to which the company or the stockholders therein would otherwise be subject."

Several banks organized under this act, and among these the Piqua Bank or branch, and another, in which the plaintiff in the case last cited was a foreign stockholder.   Subsequently, and in 1851, the general assembly passed an act taxing all banks the same as individuals, thereby imposing upon the banks in question a higher tax than they were subject to by the law of 1845.   The question raised in the first case was, as to the validity of the act of 1851.   The only difference between the cases was, that in the last case the law of the legislature was passed in 1852, under and in pursuance of a constitution different from that under which the law of 1845 was passed.   The new constitution required the legislature to pass uniform laws on the subject of taxation, and to tax banks the same as other parties.   The supreme court of the United States held that both laws were in conflict with the provision of the constitution above cited.   That the law of 1845 was a contract between the state and such banks as organized under it, and that the prohibition of any law impairing it was a limitation of the sovereign power of the state, which extended as well to the people in their original sovereign capacity, as to their legislative, executive and judicial agents.   In a word, that the restraint is imposed upon the *government* of the state, and not upon any particular branch or department of the government. The soundness of this proposition and its applicability to the cases cited are too obvious to require argument.   The result of that application is equally obvious.   A state constitution is no more nor less than a law, differing from a law passed by the legislature only in the mode of its enactment, and if in either way a state attempts to violate or evade any provision of the constitution of the United States, the law which would

produce that result is void.    But the cases cited are not in point.    The distinguishing fact in this case, and one which I think decisive of the point under consideration, is the reservation of the power by the legislature in the 37th section of the charter of the Reciprocity Bank, already cited, to alter, modify or repeal the charter, *or any of its provisions at any time.*

The language of this section, it will be conceded, reserves to the state plenary power over this charter.    It will be seen, on a careful examination of the Ohio cases, that no such power was reserved by the legislature in the act of 1845, and that that fact controlled the decision of those cases.    No mention is made in those cases of any such reservation in the act, which is fully set out in the bill filed in the case of *Dodge* agt. *Woolsey*, and it appears affirmatively from the opinion of Mr. Justice McLean, in the case of *The Piqua Bank* agt. *Knoop*, that that power was not reserved in the act.    He says: "Every valuable privilege given by the charter, and which conduced to an acceptance of it, and an organization under it, is a contract which cannot be changed by the legislature, *when the power to do so is not reserved by the charter*," thus recognizing both the validity of such a reservation and its controlling importance upon such a question.

Indeed, the right of the legislature to alter a charter previously granted, to the extent to which it has reserved the power to do so, was never questioned.    But it was urged, and I confess with much plausibility, by the learned and venerable counsel who made the principal argument upon this question, that, as by the provisions of the constitution of this state, adopted in 1822, under which this charter was granted (*article* 7, § 11), " the assent of two-thirds of the members elected to each branch of the legislature shall be requisite to every bill, &c., &c., &c., creating, continuing, altering or renewing any body politic or corporate."    And as this law of 1849 has the effect to alter the charter of this corporation, and it had not the assent of two-thirds of the legislature to its passage, the law is void.

This latter fact is undisputed, and it must be conceded that

this act does in effect alter this charter; but in connection with these facts it must be remembered that by the constitution of 1846, which was in force when the act in question was passed, the assent of two-thirds of the members of the legislature to the passage of such a bill was not required, and that this act had the assent of the requisite number of votes according to the existing constitution. The question that is presented by this phase of the case is simply this: When the power to alter a corporate charter is reserved by the legislature granting it, is the number of votes required for such alteration by the constitution in force when that charter is granted, requisite to the validity of an act altering it without regard to the time when, or circumstances under which such alteration is made? The argument of the exceptors is, that the assent of two-thirds of the members of the legislature to the alteration of this charter, which was required when it was granted, is as much a part of the charter or condition of the contract between the state and the corporation, as the rights reserved in general terms to alter the charter.

I have bestowed much reflection upon this view of the case, but I cannot assent to it. The error of the argument consists, in my judgment, in confounding the idea of a general power with the agency through which, and the form and manner in which the power is exercised.

The legislature is simply the representative and organ of the sovereignty of the state. The term is only another name for the same thing. The state, then, acting through this organ of its sovereignty, reserved to *itself* this acknowledged and essential attribute of its original power—the right at any time to repeal or alter this charter or any of its provisions. I cannot think that the existence of this power depends in any degree upon the mere form or manner in which it may be exercised. On the contrary, I think the people, who possess the power, may from time to time designate the agents or organs by which, and prescribe the manner in which the power shall be exercised. This they have heretofore done by written constitutions, in which they have imposed specific restrictions upon

In the *Matter of the Reciprocity Bank*.

their legislature and to some extent prescribed to it, forms and modes of proceeding. The powers of the legislature must of course be exercised in subordination to such restrictions and in conformity to the prescribed forms of procedure. But, subject to these qualifications, the legislature, in my opinion, may exercise any power vested in it at its pleasure. In the exercise of such power it is vested with a plenary discretion over all questions of expediency, time and forms of proceeding. If this was not so, a radical or even material change by the people in the policy and form of their government, by their organic law, would result in an unintentional surrender by them of many and some of the most essential powers of sovereignty. If, for instance, the people should in a subsequent revision of their constitution vest the legislative power of the state in one general assembly instead of a senate and assembly, by which that power is now exercised, it would no longer be possible to exercise the power reserved by the legislature in this charter, and all of the charters granted for the last thirty years. As there would no longer be *two branches* of the legislature, the assent of two thirds of the members of "each branch" could not be obtained. Can it be seriously claimed that by such a change in the form of the state government this power, so cautiously reserved by the legislature, would be abandoned, and that thenceforward the innumerable corporations created by the legislature since 1822 would be absolved from all further legislative control and responsibility to its superintending power? The statement of such a proposition seems to me a sufficient refutation of it. Upon this theory it might be argued (and I am not prepared to say that the argument would not be sound) that, by the changes made by the constitution of 1846, this and many other essential powers of the legislature had been surrendered. The change in the manner of choosing senators and members of assembly may be cited as an instance. Why might not the stockholders in these corporations argue with equal force that the condition, that the legislature should be chosen as it was at the time the charter was

granted, was as much a part of the contract as that a certain number of votes should be obtained for the alteration of the charter?

But I deem it unnecessary to pursue the argument. My conclusion in brief is, that as the power to make this alteration was reserved in express terms in this charter, and as it was exercised by an authority adequate for that purpose, and in accordance with the forms prescribed by the constitution in force when the alteration was made, the law is not obnoxious to the objection that it violates the contract with this corporation contained in its charter.

I think enough has been said to show that the act is not in conflict with the 18th section of the first article of our constitution. That section, in general terms, provides that nothing in that constitution shall affect any corporate charters granted by this state since the fourteenth day of October, 1775, meaning simply, as I read it, that all corporate rights then in existence should remain in *statu quo;* that the corporate franchise should continue to be enjoyed upon the same terms, and held subject to the same conditions that were then attached to them. As we have seen, one of the conditions of this charter was that the legislature (or the state) might at any time alter or repeal it. This was the status of the franchise when the constitution was adopted, and the provision in question, preserving it as it then *was*, did not deprive the state of the right to exercise the power reserved in the charter; and the fact, that the alteration was made by the same instrument which in this section preserved the charter subject to the right to make that alteration, is not at all inconsistent with the provisions of this section.

The next objection to the confirmation of the referees' report, relied upon by all the exceptors, is that the report shows a large amount of assets in the receiver's hands not disposed of, and that, until the assets are exhausted, the court has no power, under the act, to order an apportionment of the debts of the corporation, among the stockholders. As I have before remarked, this question was carefully considered by me, when the order

In the Matter of the Reciprocity Bank.

of reference was granted; and after an attentive reconsideration of it, aided by the able arguments of counsel, and a re-examination of the statute, I am unable to come to a different conclusion from that which I reached when I granted the order. I will refer but briefly to a few of the provisions of the statute upon which I found my opinion.

Section twelve provides that the receiver, under the direction of the comptroller, shall convert all the securities deposited by the corporation with him, "with the least possible delay," and shall also convert into cash, the effects and demands of the corporation, and for that purpose may sell any of such demands at auction, which any justice of this court may authorize to be sold. It further provides, that within ninety days from the time of his appointment, unless such time be extended by a justice of this court, not exceeding ninety days, the receiver shall make a dividend of the cash in his hands, among the creditors.

Section thirteen prescribes the order of distribution.

Section fourteen provides that if any debts, contracted after the first day of January, 1850, remain unpaid, the receiver shall, within thirty days after the declaration of the said first dividend, render an account to a justice of this court, of the debts remaining unpaid, and a preliminary account of his proceedings, stating the cash on hand, the payments made by him, and the dividends declared, &c.

Section fifteen requires him, *at the same time*, to submit to said justice a list of all persons who have been stockholders since the first day of January, 1850, together with the residence and the amount of stock held by each.

Section sixteen provides that said justice shall, *thereupon*, refer the report and list of stockholders to a referee, with directions, after giving certain notices, to apportion the debts of the corporation, incurred after the said first day of January, among the stockholders.

Sections seventeen, eighteen and nineteen contain directions as to the proceedings and report of the referee. Sections nine-

teen and twenty provide for the filing of the report of the referee, and the entry of the order of confirmation, and the effect of such order.

Section twenty-three provides that neither the dividends directed in the preceding sections to be made, *nor the apportionment of the debts* of the corporation, shall be *delayed or suspended* by reason of the pendency of any litigation, &c., &c., for the recovery of any demand *by* or *against* such corporation, unless the same shall be expressly directed by a justice of this court, &c., and that such delay shall in no case exceed one year. The latter clause of the section provides that if any prosecution shall be pending against such corporation, in which any demand against it may be established, the receiver may retain in his hands the proportion of the funds which belong to such demand, &c., to be applied according to the event of such prosecution, or to be distributed in some future dividend, to creditors or stockholders.

The twenty-fourth section provides that, if, after paying and discharging the debts, &c., there shall remain in the hands of the receiver any assets of the corporation, they shall be converted into cash and paid to the stockholders, upon whom the debts have been apportioned, according to the sums paid by them.

From these several provisions it appears to me clear that while the receiver is *peremptorily required*, within the time mentioned in the 12th section as enlarged by a justice of this court, to declare a dividend, and if after such dividend any debts of the corporation contracted after the first day of January, 1850, shall remain unpaid, to present his report to such justice containing a list of the persons who, since that time, were stockholders, &c., and that upon receiving such report said justice is as peremptorily required to refer the report to a referee, for the purpose of apportioning the debts, &c., of the corporation among the stockholders; the justice before whom the proceedings are pending is vested with an unlimited discretion as to the question whether the effects and *demands* of

In the Matter of the Reciprocity Bank.

the corporation shall be first converted into money. The 12th section, it is true, requires the receiver to convert the effects and demands into money, but no time is specified within which this is to be done, and when for that purpose a sale of the "demands" may be thought best, authority to do so must first be obtained from a justice of this court. This authority may be given or withheld in the discretion of the justice, and it is easy to see that there may be cases where it would be exceedingly indiscreet to give the receiver that authority. But whether given or withheld, the requirement that the receiver shall declare his dividend and make his report, and that *thereupon* the justice to whom the report is presented shall make an order of reference to apportion the debts among the stockholders, is equally peremptory. The question as to whether the power to direct a sale of the demands, &c., in this case has been discreetly exercised, is not presented on this motion, and I shall not remark upon it. The only question before me is that of the *power* at this time to make the apportionment. In my opinion the power exists, and to direct it seems to me to be in harmony with the manifest policy of the act. If delay and uncertainty are to attend the winding up of the affairs of these institutions, the act evidently contemplates that the resulting hardships should be borne by the stockholders rather than the creditors.

A question was made upon the argument by certain of the exceptors, as to the power of the corporation to receive its stock in payment of debts or otherwise, and to re-issue it. If this was a question between the corporation and such stockholders, it might present serious difficulties. But we are now dealing with a statute liability of the stockholders, real or apparent, to the creditors of the corporation, and I think the statute settles the question. Section second provides in express terms that the term "stockholders" shall apply not only to such persons as appear by the *books* of the corporation, &c., to be such, but also to every equitable owner of the stock. It is not necessary now to inquire whether both such apparent

and equitable owners could be made jointly liable in this proceeding, or how that liability could be enforced. It is enough that those who purchased the Merrick stock consented to do so, and were registered on the books of the bank as stockholders, and received dividends as such.

This, in my opinion, makes them liable under this act. I think there is no force in the objection that certain shares of the stock were not assessed by the referee, since it distinctly appears, from his report, that those assessed are assessed for the precise amount that they would have been had the other shares been assessed. Under such circumstances, I can seen no rational ground of complaint on their part. The answer to the various objections of the married women who were stockholders at the time of the failure of the bank is to be found in the plain terms of the act. The liability thereby created is imposed upon the " stockholders." Married women could own stock in banks in their own right, both at common law and under the act of 1848, and the acts amending it, and the legislature had the power to alter the common law so as to make them personally liable to the amount of their stock. It has thought proper to do so, and we are bound, in this as in all other cases, to enforce the liability. It is hardly necessary to remark that, as that is a statute liability, it extends to the *feme covert*, and affects her property alone. What it may be worth to creditors, or by what particular proceeding it is to be enforced in this case, are questions with which I have nothing to do.

I think the report of the referee should be confirmed, and an order accordingly must be entered in the office of the clerk of Erie county.